UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW MEXICO

In re: DAVID BRUTON and
CHARLENE BRUTON,

No. 7-09-13458 JA

Debtors.

FIRST NEW MEXICO BANK,

Plaintiff,

v.

Adversary No. 09-1187 J

DAVID BRUTON II and CHARLENE BRUTON,

Defendants.

## MEMORANDUM OPINION

THIS MATTER is before the Court following a trial on the merits of this adversary proceeding to determine the dischargeability of a particular debt under 11 U.S.C. § 523(a)(2)(A). The Court previously entered summary judgment in favor of both Defendants on Plaintiff's claim for non-dischargeability of debt under 11 U.S.C. § 523(a)(4), and entered summary judgment in favor of Defendant Charlene Bruton on Plaintiff's claim for non-dischargeability of debt under 11 U.S.C. § 523(a)(6).[1] Defendant David Bruton II stipulated to the entry of a judgment of non-dischargeability against him for the debt owing by him to Plaintiff First New Mexico Bank ("FNMB").[2] The only issue that remained for trial is whether certain debt arising from a promissory note and commercial security agreement executed by Defendant David Bruton II on behalf of the Defendants' limited liability company, Sure Printing & Signs LLC

---
[1] *See* Order Granting, in Part, and Denying, in Part, Defendants' Motion to Dismiss Third Amended Complaint on the Pleadings and for Summary Judgment (Docket No. 24).
[2] *See* Stipulated Judgment of Non-Dischargeability of First New Mexico Bank as to David B. Bruton II. (Docket No. 27).

("Sure Printing"), in favor of FNMB is non-dischargeable as to Defendant Charlene Bruton under 11 U.S.C. § 523(a)(2)(A) as a debt for money obtained by false pretenses, a false representation, or actual fraud.[3]

The Court held a trial on the merits on June 28, 2011. At Plaintiff's request, the Court allowed the parties to submit optional proposed findings of fact and conclusions of law by

---

[3] Plaintiff's Requested Findings of Fact and Conclusions of Law includes claims under 11 U.S.C. § 523(a)(4) and 11 U.S.C. § 727(a)(4). *See* Docket No. 47. However, the Court has already determined that Plaintiff's claim against Defendants under 11 U.S.C. § 523(a)(4) fails as a matter of law. *See* Memorandum Opinion, p. 16. Docket No. 23. Further, the Pre-Trial Order includes only a claim under 11 U.S.C. § 523(a)(2)(A). *See* Docket No. 44. A pre-trial order "controls the course of the action unless the court modifies it." Rule 16(d), Fed.R.Civ.P., made applicable to adversary proceedings by Rule 7016, Fed.R.Bankr.P. A final pre-trial order may be modified "after a final pre-trial conference only to prevent manifest injustice." Rule 16(e), Fed.R.Civ.P., made applicable to adversary proceedings by Rule 7016, Fed.R.Bankr.P. Because the purpose of a pre-trial order "'is to clarify the real nature of the dispute at issue, attorneys at a pre-trial conference must make a full and fair disclosure of their views as to what the real issues of the trial will be.'" *Youren v. Tintic School Dist.,* 343 F.3d 1296, 1304 (10th Cir. 2003)(quoting *Rios v. Bigler,* 67 F.3d 1543, 1549 (10th Cir. 1995)(internal quotation marks omitted)). The Pre-Trial Order does not give Defendants fair notice that FNMB intended to assert a claim to deny the Defendant's discharge under 11 U.S.C. § 727(a)(4). For this reason, the Court will not now consider a claim to deny Charlene Bruton's discharge under 11 U.S.C. § 727(a)(4).
    Plaintiff's Requested Findings of Fact and Conclusions of Law includes an alternative request to amend the pleadings "by admission of evidence to conform to the evidence pursuant to Bankruptcy Rule 7015." *See* Docket No. 47 – p. 15, ¶ 4. Plaintiff did not specify which issue it now seeks to add in accordance with Rule 15, but the Court will treat the request as a request to amend the pleadings to add a claim under 11 U.S.C. § 727(a)(4) because that claim was not included in the Amended Complaint Objecting to Discharge and for Determination of Dischargeabililty of Debt nor in the Pre-trial Order. Rule 15(b)(2), Fed.R.Civ.P. addresses amendments to the pleadings made after trial, and allows a party to seek to "amend the pleadings to conform them to the evidence and to raise an unpleaded issue" when an issue that has not been raised in the pleadings "is tried by the parties' express or implied consent." Rule 15(b)(2), Fed.R.Civ.P., made applicable to adversary proceedings by Rule 7015, Fed.R.Bankr.P. The trial court has the discretion to determine whether an issue was tried by the parties' implied consent. *Dunn v. Ewell (In re Santa Fe Downs, Inc.),* 611 F.2d 815, 817 n.2 (10th Cir. 1980)(citing *Ellis v. Arkansas Louisiana Gas Co.,* 609 F.2d 436 (10th Cir. 1979)). "The test of consent is whether the opposing party had a fair opportunity to defend and whether he could have presented additional evidence had he known sooner the substance of the amendment." *Hardin v. Manitowoc-Forsythe Corp.,* 691 F.2d 449, 456 (10th Cir. 1982)(citing *Monod v. Futura, Inc.,* 415 F.2d 1170, 1174 (10th Cir. 1969)(remaining citation omitted)). Implied consent occurs when the parties recognize an issue at trial, but acquiesce in the introduction of evidence relating to that issue without objection. *Id.* at 457 (citations omitted).
    Plaintiff's Requested Findings of Fact and Conclusions of Law includes excerpts from statements that the Debtors made at the meeting of creditors and references several of the statements contained in the Defendants' statements and schedules and asserts that these statements constitute a knowing and fraudulent false oath in connection with this case. Some testimony was elicited from the Defendants at trial concerning the Defendants' statements at the § 341 meeting of creditors, but not in the great detail now provided in Plaintiff's Requested Findings of Fact and Conclusions of law. The transcript from the Defendants' § 341 meeting of creditors was not included in FNMB's Exhibit List and was not admitted into evidence at trial. Nor did FNMB ask the Court during the trial to take judicial notice of the Defendants' statements and schedules field in their bankruptcy case. Because the evidence FNMB now seeks to rely on was not offered at trial, and because Defendants were not given sufficient notice that a claim to deny Charlene Bruton's discharge was being litigated such that Defendants did not have a fair opportunity to defend against a claim to deny Charlene Bruton's discharge, it is not appropriate to conform the evidence to the pleadings under Rule 15(b), Fed.R.Civ.P.

-2-

September 15, 2011, and, upon further request by Plaintiff, the Court extended the time through October 15, 2011. FNMB filed proposed findings of fact and conclusions of law on October 14, 2011. Defendant elected not to file proposed findings of fact and conclusions of law. After consideration of the evidence presented at trial and the proposed findings of fact and conclusions of law submitted by FNMB, and being otherwise sufficiently informed, the Court has determined that the debt at issue is dischargeable as to Defendant Charlene Bruton, and makes the following findings of fact and conclusions of law in accordance with Rule 7052, Fed.R.Bankr.P.

FINDINGS OF FACT

1. Defendant Charlene Bruton started working in the printing business at the age of 15.
2. After Charlene Bruton met her husband, David Bruton II, and they moved to New Mexico, Mr. Bruton became interested in opening a press shop.
3. Charlene Bruton worked for about two and one-half years in a print shop in New Mexico operated by a man named Steve Hagan.
4. Eventually Defendants purchased the print shop from Mr. Hagan and set up Sure Printing to operate the business.
5. Sure Printing is a New Mexico limited liability company organized on April 22, 2003. *See* Exhibit A - Certificate of Organization of Sure Printing & Signs, LLC.
6. The Operating Agreement of Sure Printing reflects that David Bruton is the managing member and is responsible for the management of the business and affairs of Sure Printing. *See* Exhibit B - Operating Agreement of Sure Printing & Signs, LLC.
7. David Bruton II was the managing member of Sure Printing at all material times.
8. Defendants were principals and owners of Sure Printing at all material times.
9. Charlene Bruton was married to David Bruton II at all material times.

10. Charlene Bruton was the registered agent for Sure Printing at all material times.

11. Defendants held Charlene Bruton out as the registered agent for Sure Printing and included Charlene Bruton as an owner of Sure Printing because they thought that it would benefit the business if the business were owned by a woman.

12. K-1 Tax Returns prepared for Sure Printing for tax years 2006, 2007 and 2008 reflect that Charlene Bruton was a "limited partner or other LLC member" and a "domestic partner" of Sure Printing. *See* Exhibit C.

13. A certified public accountant prepared the K-1 Tax Returns.

14. On or about May 21, 2004, on behalf of and as manger of Sure Printing, David Bruton II executed a Promissory Note in favor of Plaintiff in the principal amount of $50,120.00 ("Note 1"). *See* Exhibit 1.

15. Charlene Bruton did not sign Note 1.

16. On the same date, to secure Note 1, David Bruton II executed a Commercial Security Agreement on behalf of and as manager of Sure Printing.

17. Charlene Bruton did not sign the Commercial Security Agreement to secure Note 1.

18. David Bruton II personally guaranteed Note 1. *See* Exhibit 1 - Commercial Guaranty.

19. Charlene Bruton did not personally guaranty Note 1.

20. A copy of the Schedule K-1 for Sure Printing for David Bruton II and Charlene Bruton and a copy of the K-1 Detail Summary Report were in the loan file for Sure Printing maintained by FNMB. The Schedules reflect that David Bruton II and Charlene Bruton each hold 50% ownership interests in Sure Printing. The K-1 Detail Summary Report from the Defendants' Form 1040 reflects that Sure Printing is a partnership. *See* Plaintiff's Exhibit 4.

21. On or about February 21, 2007, on behalf of and as manager of Sure Printing, David Bruton II executed a Promissory Note in favor of Plaintiff in the principal amount of $60,100.00 ("Note 2"). *See* Exhibit 2.

22. Charlene Bruton did not sign Note 2.

23. On the same date, to secure Note 2, David Bruton II executed a Commercial Security Agreement on behalf of and as manager of Sure Printing. *Id.*

24. Charlene Bruton did not sign the Commercial Security Agreement to secure Note 2.

25. David Bruton II personally guaranteed Note 2. *See* Exhibit 2 – Commercial Guaranty.

26. Charlene Bruton did not personally guaranty Note 2.

27. The borrower on Note 1, Note 2, and the Commercial Security Agreements associated with Note 1 and Note 2 is identified as Sure Printing.

28. The Commercial Security Agreements associated with Note 1 and Note 2 require written permission from FNMB before the borrower can sell the collateral pledged under the Commercial Security Agreements to secure Note 1 and Note 2.

29. Sure Printing operated a printing business in the following three locations: Deming, New Mexico; Ruidoso, New Mexico; and El Paso, Texas.

30. Defendants were not aware of and did not follow all the statutory requirements applicable to New Mexico limited liability companies in conducting the business and affairs of Sure Printing.

31. Defendants held meetings of the members of Sure Printing but did not keep minutes of the meetings.

32. Charlene Bruton had the power to sign checks for Sure Printing, and in fact, she did sign checks for Sure Printing. *See* Exhibit 6.

33. The Defendants maintained a business banking account for Sure Printing that was separate from their personal bank accounts.

34. On occasion, personal funds were used to pay business expenses of Sure Printing. Defendants would discuss the need to meet a business shortfall with their personal funds before they used their personal funds to pay business expenses of Sure Printing.

35. Charlene Bruton often came to the business premises of Sure Printing and would share her opinions about the business with her husband, David Bruton, but was not actively involved in the day-to-day operations of the business, nor was Charlene Bruton aware of the general daily operation of the business.

36. David Bruton II made most of the day-to-day decisions regarding the operation of the business.

37. Sure Printing, acting through David Bruton II, sold the portion of the business operated from its Deming location (hereafter the "Deming business"), including certain collateral pledged as security to FNMB, for $45,000.00.

38. Charlene Bruton had no involvement in deciding how the proceeds from the sale of the Deming business were disbursed. She did not do anything to ensure that the sale proceeds were given to FNMB.

39. David Bruton II told Charlene Bruton that he talked with a representative of FNMB regarding the sale of the Deming business and that FNMB was "in agreement."

40. David Bruton II and Jacob Penn, then a bank officer FNMB, had a conversation regarding the sale of the Deming business prior to the sale.

41. David Bruton II was not aware at the time he sold the Deming business that Mr. Penn needed to obtain approval from the board of FNMB before approving the sale of its collateral used in the Deming business.
42. FNMB was not provided with copies of the agreements for the sale of the Deming business prior to the sale.
43. David Bruton II assured FNMB that there would be sufficient funds from the sale of the Deming business to satisfy the entire debt owed by Sure Printing to FNMB.
44. David Bruton II deposited a check in the amount of $45,000 representing proceeds from the sale of the Deming business in a Sure Printing account at FNMB, and paid $15,000 of the sale proceeds to FNMB.
45. Mr. Penn understood based on his conversations with Mr. Bruton that the buyer had made a down payment on its purchase of the Deming business, and that there would be another significant payment by the buyer to Sure Printing that would pay in full the outstanding debt Sure Printing owed to FNMB.
46. FNMB did not learn until after the sale that the sales price for the Deming business was a total of $45,000, that the sale consisted of all of the assets used by the Deming business, including collateral pledged as security to FNMB, or that Sure Printing also intended to sell its businesses operated at its Ruidoso and El Paso locations.
47. Had FNMB known that it would not be paid in full from the sale of the Deming business, it would have acted sooner to protect its interest in it collateral.
48. David Bruton II sold Sure Printing's business operated at its Ruidoso location (the "Ruidoso business"), including certain collateral pledged as security to FNMB, to Michael Sheridan, in September of 2008. *See* Exhibit 5 – Agreement of Sale.

-7-

49. David Bruton II signed the Agreement of Sale for the sale of the Ruidoso business individually, and as managing member of Sure Printing. *Id.*

50. Charlene Bruton did not sign the Agreement of Sale for the sale of the Ruidoso business. *Id.*

51. Neither David Bruton II nor Defendant Charlene Bruton informed FNMB of the sale of the Ruidoso business prior to the sale.

52. Over a period of time, David Bruton II received $3,000 from the sale of the Ruidoso business. Some portion of those proceeds was paid to FNMB.

53. Charlene Bruton was not aware of the amount of the funds received from the sale of the Ruidoso business.

54. David Bruton II and Charlene Bruton came to El Paso and presented Mr. Abdo with a form of contract for the sale of Sure Printing's business operated at its El Paso location (the "El Paso business").

55. David Bruton II sold the El Paso business, including certain collateral pledged as security to FNMB, to Roberto Abdo, in July of 2008. *See* Exhibit 5 – Agreement of Sale. The agreed purchase price was $30,000.00. *Id.*

56. David Bruton II signed the Agreement of Sale for the sale of the El Paso business individually, and as managing member of Sure Printing. *Id.*

57. Charlene Bruton did not sign the Agreement of Sale for the sale of the El Paso business. *Id.*

58. Mr. Abdo stopped making payments on the contract for the sale of the El Paso business once he learned that David Bruton II had filed a petition for bankruptcy.

-8-

59. Neither David Bruton II nor Charlene Bruton informed FNMB of the sale of the El Paso business prior to the sale.

60. Defendants did not receive the full purchase price from the purchasers from the sale of the El Paso and Ruidoso businesses.

61. FNMB did not get paid in full from the sale of the business operated at the three locations.

## DISCUSSION

Debts obtained by misrepresentation, false pretenses, or actual fraud are non-dischargeable under 11 U.S.C. § 523(a)(2)(A). That section provides:

> A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt—
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by –
> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]

11 U.S.C. § 523(a)(2)(A).

The party seeking a determination of non-dischargeability under this section must prove, by a preponderance of the evidence[4], that: "[t]he debtor made a false representation; the debtor made the representation with the intent to deceive the creditor; the creditor relied on the representation; the creditor's reliance was [justifiable][1]; and the debtor's representation caused the creditor to sustain a loss." *Fowler Bros v. Young (In re Young),* 91 F.3d 1367, 1373 (10th Cir. 1996). "False representations are 'representations knowingly and fraudulently made that give rise to the debt.'" *Adams Cnty. Dep't of Soc. Services v. Sutherland-Minor (In re Sutherland-Minor),* 345 B.R. 348, 354 (Bankr.D.Colo. 2006)(quoting *Cobb v. Lewis (In re Lewis),* 271 B.R. 877, 885 (10th Cir.

---

[4] *Grogan v. Garner,* 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991)(establishing preponderance of evidence standard of proof for dischargeability actions).

[1] *Field v. Mans,* 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995) changed the standard of reliance under 11 U.S.C. § 523(a)(2)(A) from "reasonable" to "justifiable."

BAP 2002)). False pretenses, as distinguished from false representations, "involve[] an implied misrepresentation that is meant to create and foster a false impression." *Gordon v. Bruce (In re Bruce)*, 262 B.R. 632, 636 (Bankr. W. D. Pa. 2001) (citing *In re Scarlata*, 127 B.R. 1004, 1009 (N.D. Ill. 1991)). A false representation under 11 U.S.C. § 523(a)(2)(A) includes a misrepresentation that induces another party to refrain from taking action.[5] Section 523(a)(2)(A) excepts not only new debt procured by fraud, but also "old debt which is extended, renewed, or refinanced through fraud." *John Deere Co. v. Gerlach (In re Gerlach),* 897 F.2d 1048, 1050 (10th Cir. 1990)(citing *Caspers v. Van Horne (In re Van Horne),* 823 F.2d 1285, 1288-89 (8th Cir. 1987)(remaining citation omitted)).

In defense of the non-dischargeability claim, Charlene Bruton raises the following arguments: 1) that Mr. Bruton's alleged misrepresentation to FNMB was equivocal, and that there simply could have been a misunderstanding on FNMB's part about Mr. Bruton's statements regarding the sale of the Deming business; 2) that FNMB did not justifiably rely on any misrepresentation regarding the sale of the Deming business; and 3) that, in any event, a misrepresentation by David Bruton II is insufficient to create liability for Charlene Bruton who did not sign any of the loan documents or personally make any misrepresentations to FNMB.

---

[5] *See Sun Valley Band of Goshute Indians v. Chivers (In re Chivers),* 275 B.R. 606, 619 (Bankr.D.Utah 2002)(noting that courts look to the Restatement to discern the meaning of § 523(a)(2)(A), which defines the tort of fraudulent misrepresentation as "'[o]ne who fraudulently makes a misrepresentation of fact . . . for the purpose of inducing another to act or to refrain from action in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation.'")(quoting Restatement (Second) of Torts § 525 (1976)); *Barney v. Perkins (In re Perkins),* 298 B.R. 778, 786 (Bankr.D.Utah 2003)(identifying the required elements under 11 U.S.C. § 523(a)(2)(A) as "(1) a fraudulent misrepresentation or omission; (2) *that induces another to act or refrain from acting*; (3) causing harm to the creditor, and (4) the creditor's justifiable reliance on the misrepresentation.")(citations omitted)(emphasis added). *See also, Morrow v. Zolnosky (In re Zolnosky),* 2008 WL 5157680, *3 (Bankr.D.N.M. Aug. 28, 2008)(noting that "fraudulent misrepresentation" has been defined as "'one who fraudulently makes a misrepresentation of fact . . . for the purpose of inducing another to act or to refrain from action . . . '")(citations omitted).

-10-

### *Charlene Bruton made no misrepresentations to FNMB*

Even assuming that David Bruton II made a misrepresentation to FNMB regarding the sale of Sure Printing's business operated from its Deming location that left FNMB with the false impression that the initial amount the buyer paid to Sure Printing was only a down payment and that proceeds from the sale of the business operated at the Deming location would pay Sure Printing's debt to FNMB in full, FNMB has failed to established a claim of non-dischargeability under 11 U.S.C. § 523(a)(2)(A) as to Charlene Bruton. It is clear from the evidence before the Court that Charlene Bruton did not make any direct representations to FNMB. The only misrepresentation that Defendant Charlene Bruton even arguably may have made in connection with the transactions at issue is a representation to Mr. Abdo in the Agreement of Sale for the El Paso business that, upon closing, the assets of the El Paso business would not be subject to any liens or otherwise pledged as collateral to FNMB. Even if Ms. Bruton made such a misrepresentation, that misrepresentation was not made to FNMB. Further, there is no evidence the FNMB ever saw the Agreement of Sale. Consequently FNMB could not have relied on any representation made by Charlene Bruton. Thus, to prevail on its non-dischargeability claim against Charlene Bruton, FNMB must demonstrate that it is appropriate to hold Charlene Bruton responsible for the alleged misrepresentations of David Bruton, II to FNMB.

### *Imputation of Liability based on Agency Principles*

FNMB asserts that Charlene Bruton and her husband, David Bruton II, were both general partners in their Sure Printing business, and that, as a general partner, Charlene Bruton has non-dischargeable liability to FNMB. There is case law to support the imputation of non-dischargeable liability to general partners who did not actively participate in fraud committed by

-11-

another general partner based on partnership agency principles.[6] However, the evidence in this case is insufficient to establish that Sure Printing was a partnership rather than a limited liability company. The Certificate of Organization for Sure Printing reflects that Sure Printing was formed as a limited liability company in April of 2003. *See* Exhibit A. Checks for Sure Printing reflect the account holder as "Sure Printing & Signs, LLC." *See* Exhibit 6. Note 1, Note 2, and the Commercial Security Agreement reflect the borrower as "Sure Printing & Signs, LLC" and were signed by David Bruton as "Manager of Sure Printing & Signs, LLC." *See* Exhibit 1. The fact that the K-1 Detail Summary from the 2003 Tax Return reflects that Sure Printing is a "partnership" or that Charlene Bruton is a "domestic partner" is insufficient by itself to change the business form. Because the evidence is insufficient to demonstrate that Charlene Bruton and David Bruton were partners rather than co-owners and members of a limited liability company, it is not appropriate for the Court to impose liability on Charlene Bruton based on agency principles.

*Piercing the Corporate Veil*

Alternatively, FNMB asserts that the Court should ignore Sure Printing's business form as a limited liability company under a veil piercing theory and hold that Charlene Bruton is

---

[6]*See, e.g., Strang v. Bradner,* 114 U.S. 555, 5 S.Ct. 1038, 29 L.Ed. 248 (1885)(imputing liability of guilty partner to innocent partners, provided the guilty party acted within the scope of his authority and provided that the partnership benefitted from the fraud in some way, whether direct or indirect); *Luce v. First Equip. Leasing Corp. (In re Luce),* 960 F.2d 1277, 1284 n. 9 (5th Cir. 1992)(fraud of one partner may be imputed to another partner for acts taken in the ordinary course of the partnership's business); *In re M.M. Winkler & Associates,* 239 F.3d 746 (5th Cir. 2001)(holding that debt arising from innocent partner's fraud, and for which innocent partner was jointly and severally liable under state law, was non-dischargeable under § 523(a)(2)(A)); *In re In re Tsurukawa,* 287 B.R. 515, 527 (9th Cir. BAP 2002)(imputing fraud of one spouse to the "innocent" spouse upon a finding that the spouses operated a partnership business, reasoning that one partner's wrongdoing that occurred during the course of the partnership business can be imputed to an innocent partner); *Cutcliff v. Reuter (In re Reuter),* 427 B.R. 727, 757 (Bankr.W.D.Mo. 2010), *aff'd,* 443 B.R. 427 (8th Cir. BAP 2011)(acknowledging that, "[i]n the Eighth Circuit, a partner's liability under § 523(a)(2)(A) may be imputed to an agent or partner even in the absence of evidence that the agent or partner knowingly participated in the fraud.")(citing *In re Treadwell,* 423 B.R. 309, 316 –18 (8th Cir. BAP 2010)); *Maynard Sav. Bank v. Banke (In re Banke),* 275 B.R. 317, 329 (Bankr.N.D.Iowa 2002)(stating that "[i]f a husband and wife are partners in a business, separate from the marital relationship, both may be held responsible for the fraudulent acts of one of them.")(citations omitted)

personally liable to FNMB. The Court finds that FNMB has not demonstrated that Charlene Bruton should be held personally liable under a veil piercing theory.

Limited liability companies, like corporations, are treated as legal entities that are separate from their individual members.[7] Only under special, limited, circumstances is it appropriate to disregard the separate business entity, pierce the corporate veil, and hold the individual members or shareholders liable. *Scott v. AZL Resources, Inc.,* 107 N.M. 118, 121, 753 P.2d 897, 900 (1988).[8] Under New Mexico law, a party seeking to pierce the corporate veil must demonstrate three separate elements: "a showing of instrumentality or domination, improper purpose, and proximate causation." *Id.* (citing *Harlow v. Fibron Corp.,* 110 N.M. 379, 382, 671 P.2d 40, 42 (Ct. App. 1983).

In support of its argument that the Court should pierce the corporate veil of Sure Printing and hold Charlene Bruton personally liable, FNMB points out that Charlene Bruton and David Bruton II were the only members of Sure Printing, and asserts that the sale of all the assets of Sure Printing without paying FNMB is not a legitimate use of the business. FNMB also identifies several violations of the New Mexico limited liability act by Sure Printing as further

---

[7] *See First New Mexico Bank v. Bruton (In re Bruton),* 2010 WL 2737201, *5 (Bankr.D.N.M. July 12, 2010)("business forms like corporations and limited liability companies generally protect individuals from personal liability unless the individual officer, director, shareholder or limited liability member actively participated in the wrongful acts, or cause otherwise exists to pierce the corporate veil.")(citations omitted).

[8] Of course individual officers of a corporation and members of a limited liability company who act fraudulently can be held personally liable for their own fraudulent actions. *See* N.M.S.A. 1978 § 53-19-13(2001 Repl. Pamp.)(regarding liability of members and managers of limited liability companies to third persons and providing that "[n]othing in this section shall be construed to immunize any person from liability for the consequences of his own acts or omissions for which he otherwise may be liable."). *See also, e.g., Capitol Indemnity Corp. v. Interstate Agency, Inc. (In re Interstate Agency, Inc.),* 760 F.2d 121, 125 (6th Cir. 1985)(stating that "[i]t is well established that a corporate officer or agent is personally liable for torts committed by him *even though he was acting for the benefit of the corporation.*")(emphasis in original)(quoting *A & M Records, Inc. v. M.V.C. Distributing Corp.,* 574 F.2d 312 (6th Cir. 1978)(internal quotation marks and citations omitted)); *Bombardier Capital, Inc. v. Tinkler (In re Tinkler),* 311 B.R. 869, 875 (Bankr.D.Colo. 2004)(acknowledging that if a corporate offer's "individual actions, as opposed to his general corporate control, caused the corporation's tortious act, . . . he may be held to account.")(citation omitted); *Am. Sav. & Loan Ass'n v. Weber (In re Weber),* 99 B.R. 1001, 1011 (Bankr.D.Utah 1989)(stating that "[a]n officer, director or shareholder of a corporation will not be shielded by the corporate veil from liability for tort, including fraud, in which the individual is involved.").

evidence in support of its assertion that the corporate veil of Sure Printing should be pierced. *See* Plaintiff's Requested Findings of Fact and Conclusions of Law, pp. 8 – 9 (Docket No. 47). The Court finds that FNMB falls well short of demonstrating that Charlene Bruton should be held personally liable under a veil piercing theory.

First, mere control of a business entity is insufficient to warrant piercing the corporate veil. *Scott v. AZL,* 107 N.M. at 122, 753 P.2d at 901. And while Charlene Bruton is identified as a 50% owner of Sure Printing who had authority to sign checks on behalf of Sure Printing, there is no evidence that she exercised complete dominion and control over Sure Printing sufficient to ignore its business form. Charlene Bruton's position as registered agent and member of Sure Printing is insufficient to render her personally liable for the fraud committed by Sure Printing through its managing member, David Bruton II.[9] Second, there is no evidence that Sure Printing was formed for an improper purpose, or that Charlene Bruton used Sure Printing as part of an overall scheme to intentionally defraud FNMB, or that the alleged fraudulent act in question was anything other than an isolated incident affecting one business transaction.[10] Ms. Bruton may have been present when Mr. Bruton met with Mr. Abdo to discuss the sale of the El Paso location, and she may have prepared the agreement for sale, but she also testified that Mr. Bruton assured her that he had discussed the sale of the business with FNMB and that FNMB was fully aware. The Court finds Ms. Bruton's testimony credible. Finally, the fact that Sure Printing failed to maintain all the formalities required for a limited liability company under

---

[9] *Cf. Lobato v. Pay Less Drug Stores, Inc.,* 261 F.2d 406, 409 (10th Cir. 1958)("merely being an officer or agent of a corporation does not render one personally liable for a tortious act of the corporation.").

[10] *See Scott Graphics, Inc. v. Mahaney,* 89 N.M. 208, 549 P.2d 623, (Ct.App. 1976)(acknowledging that it is appropriate to look "behind the corporate façade to the individual individuals who own the corporation . . . . where the corporation was set up for fraudulent purposes . . . '")(quoting *Shillinglaw v. Owen Shillinglaw Fuel Co.,* 70 N.M. 65, 69, 370 P.2d 502, 505 (1962)(internal quotation marks and internal citation omitted)). *Cf. Garcia v. Coffman,* 124 N.M. 12, 946 P.2d 216 (Ct.App. 1997)(finding that defendant's use of corporation as part of "a scheme to generate income through the provision of unnecessary medical services" was an improper purpose sufficient to pierce the corporate veil).

applicable state law is insufficient grounds, under the circumstances of this case, to find that the identity of the limited liability company has merged into its members and attach personal liability to Charlene Bruton. The failure to adhere to corporate formalities is but one factor for the Court to consider in assessing whether the individual has used the business entity for an improper purpose.[11]

### *The effect of the guaranty signed by David Bruton II*

FNMB argues that the guaranty David Bruton II executed in favor of FNMB binds the community such that Charlene Bruton is also personally liable for the debt that is non-dischargeable as to David Bruton II, relying on *In re Silver,* 367 B.R. 795 (Bankr.D.N.M. 2007), *aff'd,* 378 B.R. 418 (10th Cir. BAP 2007) and *In re Fingado,* 113 B.R. 37 (Bankr.D.N.M. 1990), *subsequently aff'd by* 995 F.2d 175 (10th Cir. 1993). FNMB's reliance on *Silver* and *Fingado* for this proposition is somewhat misplaced.

*Fingado* confirms that, under New Mexico law, there is a presumption that debts incurred by either spouse during marriage constitute community debts, and that community debts may be satisfied from the community property interests of both spouses. 113 B.R. at 42 (citing N.M.S.A. 1978 § 40-3-9(A) and (B) (Repl.Pamp. 1989)). *See also* N.M.S.A. 1978 § 40-3-9(B) (Repl.Pamp. 2006)("'Community debt' means a debt contracted or incurred by either or both spouses during marriage which is not a separate debt."). In *Fingado,* the bankruptcy court also addressed the wife's claim that the fraud committed by her husband was his separate tort so that the judgment should not be collectible from her share of the community property. *Id.* at 43. The

---

[11] *See Jemez Agency, Inc. v. CIGNA Corp.,* 866 F.Supp. 1340, (D.N.M. 1994)(noting that in assessing whether the corporation was used for an improper purpose, "undercapitalization, sham formalities or formation, or fraudulent manipulation or mismanagement resulting in losses, are all factors to be considered.")(citing *Scott v. AZL Resources,* 107 N.M. at 122, 753 P.2d at 901). *Cf. In re Teta,* 2011 WL 2435948, *4 n. 25 (Bankr.D.Colo. June 16, 2011)(the Colorado state limited liability company statute expressly provides that "'the failure of a limited liability company to observe the formalities or requirements relating to the management of its business and affairs is not in itself a ground for imposing personal liability on the members for liabilities of the limited liability company.'")(quoting Colo.Rev.Stat. § 7-80-107(2)).

-15-

Case 09-01187-j    Doc 50    Filed 12/12/11    Entered 12/12/11 16:44:19 Page 15 of 18

*Fingado* Court held that if the tort committed by one spouse had an actual or potential benefit to the community, the debt resulting from the tort committed by one spouse is a community debt. *Id.* (citing *Dell v. Heard,* 532 F.2d 1330, 1334 n. 2 (10th Cir. 1976)(remaining citation omitted)).

*Silver* also considered the issue of who bears the burden of establishing whether a tort is a separate or community tort. *Silver* 367 B.R. at 804. In *Silver,* the bankruptcy court pointed out that if the plaintiff shows that a debt is incurred by a spouse during the marriage, the spouse who seeks to establish that the debt is a separate debt resulting from the separate tort of the other spouse bears the burden of coming forward to show that the tort did not benefit or have potential benefit to the community. *See Silver,* 367 B.R. at 804 (citing *First Nat'l Bank in Albuquerque v. Abraham,* 97 N.M. 288, 290, 639 P.2d 575, 577 (1982)(remaining citation omitted)). Thus, under New Mexico law, unless the spouse asserting that a tort committed by the other spouse during the marriage is a separate tort satisfies her burden of coming forward, the debt resulting from the tort is a community debt subject to satisfaction from the community property of both spouses.

Here, David Bruton II allegedly committed a tort during the marriage by making misrepresentations to FNMB. Consequently any debt resulting from such misrepresentations is a community debt unless Mr. Bruton's spouse, Charlene Bruton, comes forward with evidence to show that the tort did not benefit or have a potential benefit to the community. Insufficient evidence was presented to the Court on the issue of whether any tort that gave rise to the debt stipulated by Mr. Bruton to be non-dischargeable benefitted or potentially benefitted the community. Because it was Charlene Bruton's burden to come forward with evidence to show

that there was no benefit or potential benefit to the community,[12] the Court finds that the non-dischargeable debt is community debt.

However, the fact that a debt resulting from a community tort committed by one spouse is declared a non-dischargeable community debt that may be satisfied from the community property interests of both spouses does not make the other spouse personally liable for the debt.[13] If a spouse is personally liable for a debt, the debt may be satisfied from that spouse's separate property.[14] As explained in *Midi Music Center, Inc. v. Smith (In re Smith),* 140 B.R. 904 (Bankr.D.N.M. 1992):

> Once the Court has determined that only one spouse has committed [a community tort] which make the debts nondischargeable, the community property is liable. Only the separate property of the innocent spouse will not be available to satisfy creditors.
>
> *Smith,* 140 B.R. at 909.

Thus while FNMB may look to the community property of both Defendants to satisfy the non-dischargeable debt of David Bruton, Charlene Bruton is not personally liable for the non-dischargeable debt. Any separate property of Charlene Bruton cannot be attached to satisfy the community debt resulting from David Bruton's community tort committed during the marriage that forms the basis of the non-dischargeable debt.

## CONCLUSION

---

[12] *See Silver,* 367 B.R. at 804-05.

[13] *See Optekar v. Tickemyer (In re Tickemyer),* 2011 WL 1230326, * 11 n. 17 (Bankr.D.Idaho Mar. 31, 2011)(noting that despite a lack of personal liability for the attorneys' fees related to the non-dischargeability action as to the wife, the award against the other husband is nevertheless presumed to be a community debt; thus the community property (but not the separate property of the wife) is subject to the debt)(citing 11 U.S.C. §§ 524(a)(3) and 541(a)(2) and *Petro Concepts, Inc. v. Mundt,* 2009 WL 5386131, at *11 n.30 (Bankr.D.Idaho Dec. 9, 2009)).

[14] *See Arcadia Farms Ltd. v. Rollinson (In re Rollinson),* 322 B.R. 879, 880 (Bankr.D.Ariz. 2005):
>  once it has been determined that a debt is nondischargeable as to one spouse and that the debt is a community debt under state law, the 'innocent' spouse defense applies only to the issue of whether the innocent spouse's sole and separate property may be held liable for that debt. In other words, once a community debt is determined to be non-dischargeable as to one spouse, it is nondischargeable as to their community property . . .
>
> *Rollinson,* 322 B.R. at 880.

Based on the foregoing, the Court concludes that FNMB has failed to meet its burden of demonstrating that the debt at issue is non-dischargeable as to Charlene Bruton. Charlene Bruton did not make any misrepresentations to FNMB, and non-dischargeable liability cannot be imputed to her under agency principles. Further, the evidence was insufficient to establish that the business form of Sure Printing should be ignored. Because Charlene Bruton did not come forward with evidence to show that the community tort committed by David Bruton during the marriage had no benefit or potential to the community, FNMB will be able to collect its non-dischargeable judgment against David Bruton II from both spouses' interest in community property. However, Charlene Bruton is not personally liable for the non-dischargeable debt of David Bruton II to FNMB, and FNMB cannot collect that debt from the separate property of Charlene Bruton.

This memorandum opinion constitutes the Court's findings of fact and conclusions of law entered in accordance with Rule 7052, Fed.R.Bankr.P. A separate judgment consistent with this memorandum opinion will be entered.

_____
ROBERT H. JACOBVITZ
United States Bankruptcy Judge

Date entered on docket: December 12, 2011

COPY TO:

**Frederick H Sherman**
Attorney for Plaintiff
210 S Silver Ave
Deming, NM 88030-3716

**Steve H. Mazer**
Attorney for Defendants
2501 Yale Blvd. SE, Suite 204
Albuquerque, NM 87106